Before we have our regularly scheduled arguments, we have one of these happy occasions when we admit, I assume, as the movement, I shouldn't presume, our law clerks to membership of the Bar of the Court. And as I am the movement, I will temporarily, for a few moments, pass the presiding judge function to Judge Shaw. I understand that Judge Lurie has a motion to make. Thank you. I will do so. I move the admissions of Jonas Anderson, who is a member of the Bar and Good Standing of the Highest Court of California, and Brenda Lee, who is a member of the Bar and Good Standing of the Highest Court of New York. I have knowledge of their credentials and am satisfied that they possess the necessary qualifications. That's what I'm supposed to say, and so I've said it. What I'm not necessarily obligated to say is that they have been wonderful law clerks. I have enjoyed working with them. They are wonderful people. Jonas is going on to an academic position, and Brenda to another clerkship. And I will be very sorry to lose them, and I wish them the very best. And I'm confident that they will be fine lawyers and successful in whatever they do in the legal field. So I hereby move their admission. Thank you, Judge Lurie. Well, the panel has considered all of the moving papers and the several amicus briefs that were filed. And we've also considered Judge Lurie's presentation today, and we're happy to grant the motion. And I will just add parenthetically that Judge Lurie's chambers are adjacent to mine. So Mr. Anderson and Ms. Lee are neighbors of ours, and I know that they've been invaluable assistants to the judge and also to the court this year. So again, the motion is granted, and I would ask you to please step over to the clerk of the court, Mr. Horbally. Please raise your right hand. Do you swear or affirm that you will report yourself as attorneys and counselors of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? Congratulations, and welcome to the bar of the United States Court of Appeals. We look forward to having you with us. This morning our regular schedule of cases consists of six cases on the calendar, three government employee cases, two patent cases, and a case from the claims court. Two of the government employee cases and one of the patent cases will be submitted on the briefs and not argued. So we have three argued cases. The first one is Republic Savings Bank and Public Service Company of New Mexico v. United States 2008-5075. Ms. Davidson. Good morning, and may it please the court. The decisions of this court have made the law abundantly clear with respect to restitution that the non-breaching party may not be placed in a better position than it occupied prior to the contract. In other words, it can't receive a windfall as a result of the restitution award. However, that's precisely what happened in this case. The plaintiff received an amount. Well, that's because of the way you view the point in time at which we're supposed to value the equity contribution and the stream of earnings, $12 million stream of earnings. No, it's because of the record in this case, Your Honor, and because of the plaintiff's claims. What happens if, well, your brief says quite clearly you believe that the proper valuation is the $2.235 million of actual cash money that came into the savings bank, and you're saying that you don't believe we should value as of the date of the closing. I read your summary judgment brief filed in 1993 below, and you made very clear on summary judgment that as a matter of law, the marking, the times we're valuing should be at a date after the closing. Are you talking about the net liabilities at that point? I'm talking about the entirety of the $17 million. I'm going to call that the equity. I'm going to call it the capital contribution. The plaintiffs are arguing sort of a two-prong argument. One is that they should be entitled to that amount simply because it was on the accounting records. This Court's decisions in Glendale, CalFed, LaSalle reject that argument, that you don't just look at the accounting entry. You must look at the reasonable market value, and that's exactly what this is. As of when? As of the date of performance. The law is really clear. Going back to ACME. The performance was closing the deal in order to allow you, the government, to allow these institutions to remain open. No, performance is when the party is called upon to perform the obligations under the contract. In this case, one of the obligations, for example, the equity interest was presented through 1993. Your reply brief, right, says in essence at page 28, if we conclude that the contribution should be valued at the time of contracting, then you want a remand. What I'm saying to you is assume for purposes of argument that we hold that the valuation has to be at the time of contracting. Right. Have you preserved the right to ask for a remand? Yes. Below, when we cross-move for summary judgment, we reserve the right to proceed to trial. Not in your summary judgment motion. Excuse me? Your summary judgment, your response, your opposition to the summary judgment on the damages filed November 3rd, 2003. It does say that the court should go to trial. It says as a matter of law. Well, we believe we should prevail as a matter of law, but if the trial court rejects our cross-motion. If we reject that proposition. Or if you at this point. Unless you have actually preserved the argument that there was a material issue and dispute as to the actual valuation at closing of the so-called $17 million package. If you didn't preserve that, then you're not entitled to a remand. With respect, Your Honor, we did reserve it below. It's in our cross-motion for summary judgment. We said that if the court denied our cross-motion for summary judgment, then it should proceed to trial. And I'd also note that in Hanson, where this court made it clear that stock, which was not contributed in this case, but that stock could be considered a contribution for purposes of restitution, the court nevertheless remanded the case for further proceedings to determine the reasonable market value of the stock. It wasn't just the nominal value or the value recorded on the accounting books at the time of closing. Which case was that? Hanson. Hanson. The court said there has to be further proceedings with expert discovery, which the government consistently tried to obtain in the case below. We argued both with respect to the plaintiff's original claims and their second round of claims, which included this restitution claim, that expert discovery was necessary to determine the values of their claims. Wasn't there a CD contributed here? And isn't that actual capital in full value? No, Your Honor. The plaintiffs obtained a CD, but they did not put it into the thrift. And after they recorded on their own books, not cash distributed to the thrift, but on their own books, they recorded an amount for $12 million, and then they cashed the CD and kept the money. An allocation to the thrift. Allocation of what? Of profits that should be distributed to the thrift. Was it on the balance sheet, income statement? Where was it recorded? On their annual, it must have been their annual reports. It's either in the balance sheet or in the income statement. Right. It must have been on their balance sheet. Unless it was in a footnote. It must have been on their balance sheet. But the point is they never downstreamed the money to the thrift. They allocated on their books, but they never put the money into the thrift. So they could have made two claims. They could have said, we're entitled to the $2.35 million. The deal also, the negotiated deal also provided for $600,000 a year in cash, right, to be coming from BCD into the foreign exchange. Right, and that's the $2.35 million. And so they could have said, we're entitled to the $2.35 million. If you were going to use the closing date as the operative date, not the date of performance, which is what the restatement and this Court's decisions hold, then you still have to determine the fair market value at the date of closing, which would require discounting for the risk that none of those amounts ever would be paid. At most, for example, on the earnings preference, at most they were required to provide $12 million. But that was only if profits were earned in that related company. So to determine the value of that promise, you would have to take into account the risk that it wouldn't be paid. Let's assume, for example, the contribution had been 10,000 shares of IBM market value, right, at the closing. Right. Well, the performance was closing the contract, right? Well, the performance would have been contributing the stock, which may or may not have been on the same date. Right. The performance here was contributing the partnership interest and the $12 million stream of income. Right. Okay, the $12 million stream of income never materialized. All that came in was a promise, a promise. My point is, when it comes to valuing, you keep wanting to push the valuation date away from the closing, away from the day when everybody signed the contract. Because those are the facts of this case. The equity interest was contributed over time. You told me a minute ago that in the stock hypothetical, performance is as of the date of signing the contract. If that's when it was contributed. It's at the date of performance. If in your hypothetical, the stock was contributed. The thing of value, the thing of value, the right to $600,000 a year at least the rest of your life, that was contributed at the closing. That isn't really in the record. The only reference to this. No, it's not in the record. If you read what the transaction was, you see very clearly that the FLUB, the Home Owned Bank Group, was worried that this was an all-paper transaction. And they said, we need some cash. And so they sat down and they had a break in the meeting. It's in the record. And they came back and they said, we'll not only give you $600,000 in cash every year, but we'll give you $600,000 more added on to the earnings report. Right, but they didn't get that money on the date of closing. It was just another promise, just like the promises in Westfed, which this court said were completely inappropriate as a basis for restitution. So really the issue here for this part of the case is whether the promises are more like the promises in Westfed, which the court said are completely inappropriate as any basis. You wouldn't even value them for restitution. Or are these promises more like the stock in Hanson, where the court said that could count as a contribution, but the court remanded the case, even though there had already been a trial, remanded the case and said that the trial court had to make findings of the reasonable market value of the stock and on the date it was contributed. Here, this isn't even, we don't think this rises to the level of the contribution in Hanson, because the equity interest in this case, first of all, it was contributed over time up to 1993. But if you disagree with me, you claim entitlement preserved right to a remand. Okay. I would like to talk briefly about two other errors in the case that are important, very important to us. Can I just make one point about that? Of course. As I understand the government's theory here is that the $17 million that the plaintiffs put up, supposedly in the form of these contract rights, if you call them that, in terms of the real world, it was illusory. It was just illusory. It wasn't worth that. It certainly wasn't worth the face value. So the United States government was willing to allow these two failed thrifts to reopen and attract money from hardworking taxpayers, with the United States government putting its housekeeping seal of approval. This is a healthy institution. At the day they opened that new bank, and you said at the same time the regulators knew it was a fraud. It wasn't worth it. It was out of real concern. The regulators knew that the paper they were getting was not worth it, and they noted that this was a very unusual case. You're conceding that the regulators knew it was a fraud on their part. Well, I think that the Supreme Court has recognized and this Court has recognized many times that what the regulators did during the savings and loan crisis was, you know, they thought they were in an emergency situation. They engaged in accounting gimmicks. And you shouldn't have to pay for it now. The taxpayers shouldn't have to pay an award six times the amount of damages actually suffered by the plaintiff. You're getting into your rebuttal time. Do you want to deal with the tax issue you were about to deal with? Yes, let me just say really quickly on the receivership. The trial court completely ignored the Supreme Court's decision in O'Melveny and Myers v. FDIC. This Court's many decisions recognizing the distinction between the FDIC and the RTC as receiver and the United States, that part of the award is completely inconsistent with this Court's decisions. The United States, if anything, would have been a creditor in the receivership. That part of the award is contrary to the statutory scheme, which requires the receiver to recover its trust. And finally, it's also compensatory. The Court called it restitution, but it doesn't put the plaintiff back in the pre-contract position. It purports to give it the value of the thrift it lost post-breach. This is on the sale premium? Excuse me? On the sale premium. Yes. Not the tax issue. And that is a very important issue to us because it confuses entities that have been long clarified within. On the tax issue, is there absolutely no dispute as to the amount of money that was enjoyed as a result of the NOLs? 4.8 something or other? That's correct, Your Honor. And also, there's no dispute that the plaintiffs asked the regulators and obtained promises to structure the deal so that they could take advantage of those NOLs, which makes this different from, you know, the tax benefits. So if we agree with you on the merits of that issue, then it's your view that we should, if in whatever we do elsewise, we should say that you're supposed to get a credit for the 4.87? That's correct. Okay. Thank you. We'll give you your full rebuttal time. Thank you. Mr. Hanlon. Thank you, Your Honor, and may it please the Court. I'd like to pick up with Judge Stewart. Just a quick point. Do you agree on the tax point? If you lose on the tax point, the number is not in dispute? That number is not in dispute. Obviously, I'll get to the tax point on the merits. But let me first deal with the real critical question here. The only dispute between the parties is the legal question about the equation, how do we measure these damages? The variables that influence that equation are not in dispute. The government suggests that there is this factual dispute in this reply brief in particular, but as Judge Clevenger recognized, the government has never reserved a right for a remand on these factual points. If you look at footnote 31 of their summary judgment brief, what they say is that there's factual disputes in conclusory language. The problem is that they have discovered these facts. So you contend that in their cross-motion for summary judgment, they didn't reserve these? That's correct. Footnote 31 is the only reference they make to disputes of fact. The key point here is that nowhere in their brief, either on appeal or below, do they cite any affidavit, declaration, deposition, or expert report that quibbles with the underlying values. There's nothing of any evidence in the record that says the real estate isn't really worth $287 million. It was worth $150 or $50 or $70. There's no evidence in the record yet. That's what the other side wants to put in on a remand. Exactly. But discovery has been going on. This case is 17 years old. Discovery went on for years. And although Ms. Davidson says that they have been trying to obtain expert additional discovery, they filed a motion, a Rule 56G affidavit, claiming they needed more discovery. Judge Smith below denied that request. That is an abusive discretion review. They have not preserved that on appeal. They have not appealed the judge's refusal. You'll find his refusal, excuse me, at page 100-100 of the joint appendix. He recognizes that the government's request for discovery is unnecessary. It's based on conclusory assertions. So they even haven't preserved the right to obtain additional discovery. The record is as it's always going to be in this case. And what you have is not a single identification, a single reference to anything suggesting that the value of these assets is anything other than what the government regulators signed off on. Is that true at 100628? This is a document that wasn't made until 1989, but it's valuing this equity interest back as of the original date. And it says that the RSB, the savings bank, was booking this at one value and BHL at another. Yes. Why is that? That is, and you'll find an explanation for that at page, if you look at Ernst and Winnie's opinion at page 100-262-263 of the joint appendix, Ernst and Winnie recognizes that what you have there is that BHL was the transferring entity and it had on its book values the historical basis of the property. This is a 36-year-old partnership. It had properties that had been there for quite some time. That is their book value, the historic basis. What was recorded for RSB in 1985 was the present current market value. That was the whole purpose. And Ernst and Winnie goes through in quite some detail in those two pages, recognizing whether, as an accounting matter, RSB could book it based on the historic book value or the present market value. So there's no distinction difference. And the important point, once again, is that despite that discrepancy between one party's historical basis and the current market value, what the government does not do is contest that the current market value as of 1985 was indeed worth $5 million, this partnership share. There's nothing in the record that they can point to to dispute that key critical point. Turning to the $12 million, again, there's no dispute that RSB was in fact So your point is if the government wants to fall back to its fallback position, which is a remand for valuations required, it's too late. They should have been putting in these valuation numbers at an earlier point in time. Precisely, just as any party is required to do. And it's not as if there hasn't been enough time in this case to do that. Discovery was extensive. And again, even when they sought additional discovery, Judge Smith, at page 100 of the appendix, denied the need for additional discovery. That is a decision reviewed for abuse of discretion. Obviously, there was no abuse, and it certainly has been waived. They have not even appealed their right to obtain additional discovery. Was RSB free, if it wanted to after the closing, to sell its 1.7 share in the partnership at will? Not at will, no. But is the so-called $12 million earnings preference tied to continuing to own 1.74 in the partnership? No, and that's the critical point about the earnings preference. The whole notion of the preference was even though you're entitled, as a 1.74 percent owner of this partnership, to just that share of the profits, we're going to give you in the first year $12 million off the top of those profits, despite the fact that you only would otherwise be entitled to 1.74. We're going to book your right to them, but we're not going to flow the cash. Well, they booked those profits and, in fact, reported them to the IRS. It was good enough to report to the IRS as income. RSB? RSB, yes. And you'll actually find this in the government's own exhibits. If you look at page 101.416 of the joint appendix, the government's own expert, dealing with a slightly separate question at paragraph 38 of his report, recognizes that RSB earned $12.6 million in 1986, as he says, due to their investment in BCD, end quote. And this is all because everything is on accrual accounting from the real estate company right up? Yes, but it's on accrual accounting, Your Honor. I'm not saying in a pejorative way. In that period of time, lots of things were on accrual. And particularly in real estate investments where there was a lot of cash that had to be preserved. And the critical point here is, and you'll see that even RSB's own reports recognize, and this is at page 103.77 of the joint appendix, that they earned. What was the restriction on RSB's freedom to sell the 1.74% equity interest? They needed to obtain the approval of the general partner of MCB. But that makes it just like most limited partnerships that have restrictions. It doesn't diminish the value. At the time, I've read what you gave us in the record, and I got the record from below, which I haven't finished yet, but it struck me that there were negotiations going on between the flub officials in Chicago and the promoters. Because the $600,000 in cash showed up as a negotiation, and the 1.74 came up from 1.6 at some stage in the game. Can you, Representative, know whether or not at the time of those negotiations, any of the financial statements of BCD were given or shown to the government? Yes. Well, the government had reviewed, as they say at page 100.285, the appraisals and opinions, and that's how they based their opinion of these records. Those appraisals and opinions included the Blake survey, which dealt with historic market values and current market values. It accounted for... And Blake was under the impression that flub was going to rely on them. Correct. And flub indeed relied on them. And not just that. A flub says they rely on them. They said they relied on them. Exactly. They didn't think that unless Blake was fraudulent, I mean, you know, if you make a statement to somebody knowing they'll rely on it to their detriment, that's five-finger fraud. Short of that, there seems to be reliance all the way around. No question. And that's why this is not a question of windfall. It might very well be a windfall if a party unloads a knowingly valueless asset and hides that. That's a different case. But where you have a situation as this one, where all parties at arms-length negotiations and the flub, and as Judge Clevenger recognized, had its own fiduciary duties to not just sign off on any random number picked from thin air, but to independently confirm it, there is no basis to suggest that there is a windfall in that situation. And ultimately, the disagreement then boils down to the threshold question, when should damages be measured? Your response to the windfall argument, I think, if I've got it right, is that even if you gave valued stock, you know, that you could mark to market on the day of the closing, and then Lehman Brothers. Yes, exactly. And that's my example. If you get a 1.7% interest from Lehman Brothers, you think that's pretty valuable, and then whoopsie-doo, a few months later, you learn that it's not worth anything.  The idea that restitution, as this Court held in Glendale, the, quote, critical event that fixes damages, end quote, is the time of the contract. And that promotes simplicity and predictability. Well, isn't that really where the major dispute is here today? Exactly, and that's why... Davidson's made quite clear that their view is performance is something that happens after. It includes the closing in some cases, but not in this one. Right, and that's an important distinction. The performance here occurred August 30, 1985, when the contracts were signed. At that point, the plaintiffs signed over a 1.74% interest in the partnership. That was not a conditional signing over. That was a, as of this date, just as in your Honor's example... So there wasn't any gap between signing of the papers and presentation of the various payment of interest. Not at all. It's closings. It's what we used to do. Precisely. What the government focuses on is that RSB never converted its 1.74% share into cash before BCD, the underlying investment, fell to zero. But the same is true any time you convert a pledged stock and you take the risk, whether it's Enron or Lehman Brothers, that a stock valued at $1,000 one day may end up being zero down the road and the recipient won't be able to... Do you want to deal briefly with the tax issue and your cross-appeals? Yes, Your Honor. The tax issue, the reason why the government's not entitled to an offset is because the government's not responsible for that generally available tax law. That law was written in 1981, recognizing those NOLs. The only thing that the government did here was to acquiesce to a structuring of the transaction that allowed the plaintiffs to maximize the benefits they otherwise would have been able to obtain all along. The government said no. The ordinary law going in was that you can't hold an equity interest at the insuring institution level. And FLUB has extraordinary power under a different statute to waive that if they want. And they could have said, we're not going to waive that. They could have done that, and then we might be in a different position. Probably be a deal-buster. It might very well be, but the offset inquiry doesn't turn on whether something is a deal-buster or not. The question under an offset is whether the government, the breaching party, can claim responsibility for conferring that benefit. It would be as if the city of Baltimore granted a zoning barrier. Well, they did, but didn't they confer the benefit when they said, yes, we will allow, we'll use the extraordinary statute to let you structure this so that you're a one-off. You'll have the only savings association in the country that can hold an equity interest. But the point is, those benefits would have been there. All that their efforts did was to ensure that those benefits could be put to even fuller use. It would be just like the city of Baltimore granting a zoning variance to allow someone to put solar tiles on their rooftop to take advantage of federal tax credits. But the government says you weren't hurt because you had the same amount of NOLs lying over someplace else, and you were able to use those. Well, that's certainly one of the arguments we've raised below. But the key point is that these are generally available benefits. The idea that parties all the time structure deals in ways to make it more tax advantageous to one party or the other. The idea that simply relenting and granting concessions in the way it's structured says nothing about whether those benefits- The reason one party doesn't hold the trump card to say you can't structure it that way. Most transaction markets are voluntarily structured. Sure, but even in situations where there might be concessions granted for one reason or another, I think it would be an odd rule to suggest that if I grant a concession to a co-contracted party that gives them massive tax benefits, that I can then take those as offsets because of my beneficence at that point. Real quickly, I know I'm $3 million. The government's not entitled to that offset simply because the plaintiffs never received that $3 million. That was money pledged to the bank. This court's dealt with scores of Winstar cases where the FISLIC has made capital contributions, sizable contributions. Never has there been an offset. And the reason is that the investors here never got that $3 million. It remained with the institution, which was then ultimately seized. I'll reserve the balance of my time. But the savings bank wasn't named as a plaintiff in most of those cases? Exactly, but- So that's toast number, perhaps? Sure, but the benefits here went to the two institutions. Those are the ones entitled. It's the same bank who's not entitled to the $17 million. We'll give you your full rebuttal time. Thank you. Ms. Davidson. I'd like to pick up where Mr. Hanlon left off with the $3 million contribution. This case is unique among the Winstar cases because the thrift is a plaintiff in this case. The plaintiffs have always made a joint claim for recovery. They've never separated out their claims according to their corporate status the way many of the other Winstar plaintiffs have. For example, in SoCal, where the shareholders had very different claims than the holding company and then the thrift itself. The plaintiffs explain that the reason they've included the thrift in a derivative status is because they want to recover that receivership, the cost that the receiver was entitled to recover under the statute for administering the receivership, and they recognize that that is a claim that only the thrift can assert. But they can't have it both ways. They can't say, well, we need the thrift here in order to pursue that pot of money but ignore the thrift when it comes to the government's offset. Also, their contribution was to the thrift, not directly to the government. So to the extent they're making an argument that the government did not give them, other than the thrift, the other parties $3 million directly, their own restitution claim should fail because they didn't give the money directly to the government. And also it's very clear from the record that without the $3 million cash contribution, this deal never would have happened. It was the only real capital contributed, and it was critical to make the deal happen. So if the government hadn't put in the money, they never would have had what they called their captive financial institution from which they could take the dollars. $20 million was the magic number that Flubb and Chicago said you've got to get to, and they said we'll pony up our 17 in the form of these contract rights, and the government said we'll put in $20 million. But the record is clear that the $3 million in cash was the linchpin, and nobody was questioning the $3 million in cash. Is this good enough for capital? Everyone was questioning the $17 million in paper. As you probably know, the record in this case is not on PACER. It's hard to sort through it from down below. Could I ask you to give us a copy of your cross-motion on summary judgment? Absolutely, and any other papers that should have been in the appendix. That's what I'd like to make clear. The government is not seeking a remand. In fact, I think that the plaintiffs should be seeking a remand because their claim on its face is inconsistent with this court's decisions. They should not be able to recover based upon accounting values. Why don't you let the judge finish? If we conclude that the valuation should be valued at the time of contracting, the court should remand the case to the trial court. If it's the time of contract, that is what the court should do. We're not seeking it because we think that they should be seeking a remand of any party because this court has consistently rejected the accounting values or the face value. When Hanson remanded the value, whatever intangible was there, were they valued as of what date? Well, the case settled on remand, but the problem was the court here said we can't just take whatever the value was on the accounting books. It was recorded with a value. Did we in our remand say value it as of the date the whole thing collapsed? A reasonable market value on the date of performance is what this court said. The date of performance would be when you contributed the stock. It depends on the case. In some cases, performance continues throughout the contract. For example, the government's goodwill performance, goodwill agreement, continued throughout the contract. Sometimes performance occurs on the date of contracting. It depends, but this court, going back to ACME, has always said restitution is measured at the date of performance. Because, for example, in ACME, Let me ask you, you would say that if they had contributed 1,000 shares of IBM stock on the day of closing, you would say that that was performance, correct? And there were not conditional, that it was actually given to the thrift without any strings attached, it was transferable. What if two months later IBM went bankrupt? Right. You would still say that you'd take the value of the IBM stock at the day of closing. Say at closing, the IBM stock is $100 a share, and then two months later it's down to $10 a share. You would still go with the value at the date of the closing, correct? If that's the market value. And your model here is that this is not a market value. Right. And if it had been a share in a closed partnership, then you would have still valued it as of the date of the contribution, but you'd just have to figure out what it was. What its market value was, discounted for risk. So what were the strings attached? You just said, what were the strings attached to the 1.74 equity interest? Well, for example, it was not marketable the way IBM stock would be. You're not listening to me. I am listening. You answered Judge Shaw by saying, well, there were no strings attached. That was his hypothetical. I'm asking you what strings were attached to the 1.74. In order to try to transfer that interest, it was an interest in a partnership, not a corporation. But in order to try to transfer that interest, prior written approval would have to be obtained from the partnership. Which is common in partnership situations. Well, normally the prior written approval must be... I've seen quite a few of those documents. Normally they say, and consent may not reasonably be withheld. This one doesn't even say that. This one is absolute consent. What strings were there on the $12 million earnings preference? Excuse me? What strings were attached to the $12 million earnings preference? Actually, to go back to your last question, another string that was attached to the $5 million was that it would only materialize change from $1.9 million as it was held on the holding company's books to $5 million if the partnership liquidated at a value that was consistent with some previous agreement that had nothing to do with the thrift. Otherwise, that was a big string attached to the $5 million. On the earnings statement, they had to earn the earnings and they had to downstream them. And they downstreamed $2.35 million. I guess the valuation has to do probably with, like, stock, you have to earn money to have a dividend. Or like the PICS and Westfed. That's exactly what the PICS and Westfed were. They were a promise for an income stream. And this court said, that's not good enough. That's just like an IOU. That's a contingent future promise. But the $600,000 cash was put on to solve that problem. The flub guy said, it is Westfed unless you kick in the $600,000. That's the $2.35 million. That's a 5% return. Would you buy a bond to give you a 5% return? Well, if I did, I wouldn't seek restitution for the whole promised income stream that I never realized, not from the U.S. Treasury. I would only seek the fair market value discounted for risk or my actual cost incurred. For those reasons, as well as those set forth in our brief, we ask that you reverse the judgment. Thank you, Ms. Davidson. Mr. Hanlon has three minutes on the cross-appeal. Thank you very much. Turning to that cross-appeal, the reason that the $3 million, the only argument the government has is that the fortuity of the savings institution being in the caption, that's not a sufficient basis to grant an offset. The key question, of course, in an offset is offset against what? It's the damages that flow to those plaintiffs who've earned it. Here, the plaintiffs who are entitled to that $17 million are the holding company and MCB, not the financial institution itself. That's the key point. There's no benefit that they've ever alleged. Well, the investors were certainly benefited. If the government hadn't put up the $3 million, the club was looking for a $20 million or not. Sure. And so your folks would have had to buck up $3 million worth of something. Yes. Right? So your investors were benefited. Yes. The question is whether they retain that benefit. The government, after all, sees the institution. Offsets are appropriate when the non-region party still has retained those benefits. But that benefit was going to be marked as of the date of the closing on your theory of the case anyhow. Yes. As of closing, if the feds had said, we're sorry, we don't have the $3 million, then it would have been another negotiation. Right. But that doesn't impact the key question or offsets that the plaintiffs never retained those values. Yes. And it's important to recognize that in WestFed, in American Capital, in scores of these courts, WestFed, Windstar cases, there have been millions of dollars in the same sorts of contributions and the same theory could have been put forth that the investors, of course, benefited. If somebody had named the savings bank, it probably would have been put forth. Well, but in WestFed, you had the holding company suing on its own behalf and derivatively on behalf of the savings institution. In American Capital, you had the FDIC suing as successor to the savings institution, yet neither, despite the sizable FISLIC contributions, was there any offset awarded in that case. That's the key reason about the $3 million. To the extent I may just quickly respond to Your Honor's final question to Ms. Davidson, put to the $12 million. Only? No, I'm sorry. Okay. Then we'll rest on it. Thank you very much. Thank you, Mr. Hammond. We'll take the case under advisement.